**FLYING CROSS CHECK, L.L.C. d/b/a Topeka Scarecrows, Plaintiff,**

**v.**

**CENTRAL HOCKEY LEAGUE, INC. d/b/a Central Hockey League, Defendant.**

**No. 01–4026–SAC.**

United States District Court, D. Kansas.

March 8, 2001.

Order Modifying Opinion March 12, 2001.

Randall J. Forbes, Kevin M. Fowler, John C. Frieden, Clinton E. Patty, Frieden, Haynes & Frobes, Topeka, KS,

Anne L. Baker, Thomas E. Wright, Wright, Henson, Somers, Sebelius, Clark & Baker, LLP, Topeka, KS, David N. Holstead, Topeka, KS, for defendant.

Jonathan C. Brzon, Tillotson, Nelson, Wiley & Brzon, Leavensworth, KS, Richard V. Eckert, Office of Shawnee County Counselor, Topeka, KS, for movant.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This removal action comes before the court on the defendant Central Hockey League, Inc.'s motion to set aside the temporary restraining order ("TRO") issued by the District Court of Shawnee County, Kansas, prior to removal (Dk.4); the motion to intervene (Dk.13) filed by the Board of County Commissioners of the County of Shawnee County, Kansas; and the plaintiff Flying Cross Check, L.L.C.'s amended motion to extend the TRO (Dk.15). On the defendant's request for a hearing, the court heard the motion to set aside on March 6, 2001. At that time, the parties' presented arguments and evidence concerning the duration, dissolution and extension of the TRO. The court took the matter under advisement and is now ready to rule.

## PROCEDURAL BACKGROUND

On February 21, 2001, the plaintiff Flying Cross Check. L.L.C. ("FCC") filed suit by verified complaint in the District Court of Shawnee County, Kansas, against the defendant Central Hockey League, Inc. ("CHL"). On the same day, the plaintiff FCC applied for and received an ex parte temporary restraining order that enjoined the defendant from:

(a) taking any direct or indirect action to terminate the Sanction Agreement between the parties or otherwise acting in any way to prevent Plaintiff from operating its hockey operations for the remainder of the 2000–2001 hockey season, including the playoffs; (b) implementing, maintaining or otherwise enforcing any actions based on the termination of the Sanction Agreement (including realigning the Central Hock-

ey League games schedule in place prior to February 20, 2001); and/or (c) preventing any Central Hockey League member club from appearing and/or playing the games as scheduled prior to February 20, 2001, based on such termination forthwith at any time prior to final hearing and disposition of Plaintiff's application for temporary injunction, including any appellate proceedings, or except as otherwise ordered by this Court for good cause shown.

On February 26, 2001, the defendant CHL filed its notice of removal in this court asserting diversity jurisdiction. (Dk.1). The petition alleges that the plaintiff FCC is a limited liability company organized and existing under Kansas law and that the defendant CHL is a corporation organized and existing under Oklahoma law with its principal place of business in Indianapolis, Indiana. The removal petition asserts the amount in controversy exceeds $75,000 in that the plaintiff FCC seeks as relief to be excused from its contractual obligation (subsection (d) of the Sanction Agreement) to make monthly payments of $10,000 which would have the pecuniary effect of denying the defendant CHL of $80,000.

Also on February 26, 2001, the defendant CHL filed a motion to set aside the temporary restraining order (Dk.4) and filed its memorandum in support of this motion late Friday afternoon on March 2, 2001. (Dk.9). The plaintiff FCC filed its response opposing this motion on March 5, 2001, (Dk.12), and later that day filed an amended motion to extend the TRO (Dk.15).

## DURATION OF STATE COURT TRO FOLLOWING REMOVAL

■ "[A]fter removal, such state court orders remain in effect but 'federal rather than state law governs the future course of proceedings.'" *Palmisano v.*

*Allina Health Systems, Inc.,* 190 F.3d 881, 885 (8th Cir.1999) (quoting *Granny Goose Foods, Inc. v. Teamsters,* 415 U.S. 423, 437, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974)). In other words, "after removal, the federal court merely takes up where the state court left off." *Alpert v. Resolution Trust Corp.,* 142 F.R.D. 486, 487 (D.Colo.1992). The court "must apply the Federal Rules of Civil Procedure and treat the case as though it were originally commenced here." *Bruley v. Lincoln Property Co., Inc.,* 140 F.R.D. 452, 453 (D.Colo.1991). Consequently "[a]n ex parte temporary restraining order issued by a state court prior to removal remains in force after removal no longer than it would have remained in effect under state law, but in no event does the order remain in force longer than the time limitations imposed by Rule 65(b), measured from the date of removal." *Granny Goose Foods,* 415 U.S. at 439–40, 94 S.Ct. 1113; *Rothner v. City of Chicago,* 879 F.2d 1402, 1418 (7th Cir. 1989); *Carrabus v. Schneider,* 111 F.Supp.2d 204, 210–11 (E.D.N.Y.2000). The Supreme Court clarified its holding in a footnote with illustrations, including this one:

> Where, however, a state court issues a temporary restraining order of 15 days' duration on Day 1 and the case is removed to the federal court on Day 2, the restraining order will expire on Day 12, applying the 10–day time limitation of Rule 65(b) measured from the date of removal. Of course, in either case, the District Court could extend the restraining order for up to an additional 10 days, for good cause shown, under Rule 65(b).

*Granny Goose Foods,* 415 U.S. at 440 n. 15, 94 S.Ct. 1113.

### Date of Removal

■ The procedure for removal is laid out in 28 U.S.C. § 1446, which states in part:

(d) Promptly after the filing of such notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties and shall file a copy of the notice with clerk of such State court, which shall effect the removal and the State court shall proceed no further unless and until the case is remanded.

"The only rule that logically follows from 28 U.S.C. § 1446(d) is that removal is effected when the notice of removal is filed with the state court and at no other time." *Anthony v. Runyon,* 76 F.3d 210, 214 (8th Cir.1996); *Traynor v. O'Neil,* 94 F.Supp.2d 1016, 1023 (W.D.Wis.2000) ("many jurisdictions ... regard the filing of the notice with the state court as a necessary step to effect removal.") (citing 14C Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3737 (3d ed. 1998) ("Accordingly, the sounder rule, and the one most consistent with the language of Section 1446(d) of Title 28, is that removal is not effective until all the steps required by the federal statute have been taken by the defendant.")); *see also Zeglis v. Sutton,* 980 F.Supp. 958, 961 (N.D.Ill.1997) ("Removal is effective when notice of removal is filed in state court."). The court agrees that the most logical reading of § 1446(d) is that removal is effective upon filing the notice in state court and that in most instances, this filing date will be the date of removal.

■ There is some dispute here over when the notice of removal should be considered as having been filed in state court. The defendant filed a notice of removal in federal district court on February 26, 2001. Its certificate of service shows that a copy of this notice was hand delivered on February 26, 2001, to FCC's counsel and to the Clerk of the District Court of Shawnee County, Kansas. Notwithstanding this certificate of service, the plaintiff submits a certified of copy of the notice of removal that was filed in state court. It bears a filing stamp date of February 28, 2001. There was no evidence or arguments offered to dispute that the state district court clerk received the notice on February 26, 2001, as provided in the certificate of service.

Section 1446(d) requires the defendant to "file a copy of the notice with the clerk of such State court." Rule 5(e) of the Federal Rules of Civil Procedure provides that "[t]he filing of papers with the court as required by these rules shall be made by filing them with the clerk of court." Filing under Rule 5(e) occurs with the delivery of the papers into the actual possession or custody of the clerk. *See In re Toler,* 999 F.2d 140, 142 (6th Cir.1993) ("filing of complaint ... is accomplished when the complaint is delivered to the clerk of the appropriate court"); *Hernandez v. Aldridge,* 902 F.2d 386, 388 (5th Cir.1990) (treats a complaint as filed when placed in the custody of the clerk), *cert. denied,* 498 U.S. 1086, 111 S.Ct. 962, 112 L.Ed.2d 1049 (1991); *Central States, Southeast & Southwest Areas Pension Fund v. Paramount Liquor Co.,* 34 F.Supp.2d 1092, 1094 (N.D.Ill.1999) (filing is complete upon delivery and receipt to the clerk's office); *United States v. Johnson,* 992 F.Supp. 1257, 1263–64 (D.Kan. 1998) (documents are filed upon delivery to the clerk's custody); cf *Jarrett v. U.S. Sprint Communications Co.,* 22 F.3d 256, 258–59 (10th Cir.) ("constructive filing" concept used for complaint submitted with an in forma pauperis application), *cert. denied,* 513 U.S. 951, 115 S.Ct. 368, 130 L.Ed.2d 320 (1994). The hand delivery of the notice of removal to the custody and possession of the Clerk of the District Court of Shawnee County, Kansas, constitutes filing for purposes of § 1446(d), D.Kan. Rule 81 .1(c); and Fed.R.Civ.P. 5(e). Consequently, the date of removal is February 26, 2001, and the ten-day period

provided in Fed.R.Civ.P. 65(b) commences on that date. ·

*Calendar v. Business Days*

■ Rule 6(a) of the Federal Rules of Civil Procedure provides that "[w]hen the period of time prescribed or allowed is less than 11 days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation." Courts apply this rule in computing the ten-day period under Rule 65(b). *See, e.g., Dan River, Inc. v. Sanders Sale Enterprises, Inc.,* 97 F.Supp.2d 426, 430 n. 2 (S.D.N.Y.2000); *Puertas v. Michigan Dept. of Corrections,* 88 F.Supp.2d 775, 778 (E.D.Mich.2000); *cf. S.E.C. v. Unifund SAL,* 910 F.2d 1028, 1034 (2nd Cir.1990) (ten business days); *Vittoria Corp. v. New York Hotel and Motel Trades Council,* 30 F.Supp.2d 431, 433 (S.D.N.Y.1998) (ten business days). Excluding Saturdays and Sundays, the ten-day period governing this TRO expires on March 12, 2001.

## DISSOLUTION OF THE TRO

■ "The essence of a temporary restraining order is its brevity, its ex parte character, and (related to the second element) its informality." *Geneva Assur. Syndicate, Inc. v. Medical Emergency Services Associates,* 964 F.2d 599, 600 (7th Cir.1992). A TRO preserves the status quo and prevents immediate and irreparable harm until the court has an opportunity to pass upon the merits of a demand for preliminary injunction. These purposes serve as threshold requirements to a TRO request. Beyond these two threshold showings, a movant also must establish the following requirements which are the same for a preliminary injunction: (1) it will suffer irreparable injury unless the temporary relief issues; (2) the threatened injury to the movant outweighs whatever damage the temporary relief may cause the opposing party; (3) the temporary relief would not be adverse to the public interest; and (4) there is a substantial likelihood that the movant will eventually prevail on the merits. *City of Chanute v. Kansas Gas and Elec. Co.,* 754 F.2d 310, 313 (10th Cir.1985). When the first three elements are met, the Tenth Circuit has modified the fourth element so that "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *Id.* at 314; *see Walmer v. U.S. Dept. of Defense,* 52 F.3d 851, 854 (10th Cir.), *cert. denied,* 516 U.S. 974, 116 S.Ct. 474, 133 L.Ed.2d 403 (1995).

■ A movant's burden is particularly heavy when the injunctive relief sought would in effect grant the movant a substantial part of the relief the plaintiff would recover upon a trial of the merits. *SCFC ILC, Inc. v. Visa USA, Inc.,* 936 F.2d 1096, 1099 (10th Cir.1991) (such injunctive relief "is similar to the 'Sentence first-Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence"). The CHL argues the TRO here affords FCC substantially all the relief it seeks to recover on the merits. The CHL contends FCC filed this suit in order to stay its termination from the CHL and to allow the Topeka Scarecrows' completion of its 2000–2001 season and any playoff games. Because the regular season ends on March 31, 2001, and the last game of the playoffs is in late April, the CHL maintains this TRO and any preliminary injunction to follow would effectively provide FCC with most of the relief it seeks in this action.

The CHL argues first a procedural basis for dissolving the TRO. Because the plaintiff has not filed an application for a preliminary injunction, the court should dissolve the TRO immediately. Rule 65(b)

does not contain any requirement or condition that a TRO may issue or remain in effect only if a preliminary injunction request is pending. Rule 65(b) does contemplate that if the need for injunctive relief extends beyond the brief periods of protection offered by the TRO provisions, then a preliminary injunction must be pursued. The FCC says it intends to apply for a preliminary injunction, and the state court's TRO reflects those same intentions. CHL's procedural challenge is not well taken.

*Irreparable Harm*

██ A harm is irreparable if money damages are an inadequate remedy because of difficulty or uncertainty in their proof or calculation. *Equifax Services, Inc. v. Hitz,* 905 F.2d 1355, 1361 (10th Cir.1990). "[L]oss of customers, loss of goodwill, and threats to a business' viability can constitute irreparable harm." *Zurn Constructors, Inc. v. B.F. Goodrich Co.,* 685 F.Supp. 1172, 1181 (D.Kan.1988); *see Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.,* 86 F.Supp.2d 1102, 1108 (D.Kan.2000) (irreparable harm due to "extreme difficulty and uncertainty in restoring goodwill among customers and regaining the business of customers").

██ As alleged in its verified petition, "[t]he loss of reputation in the community, economic revenue generated by the upcoming playoffs and threat to the FCC's present and future business operations represents irreparable harm entitling FCC to injunctive relief." (Dk.1, ¶ 22). In his recent affidavit, Jonathan Fleisig avers:

FCC seeks temporary injunctive relief from the Court to protect its reputation and goodwill, and to fulfill its commitments to the fans, the coach of the Topeka Scarecrows (who decline an offer to coach elsewhere just last week to remain with this team), the players in our organization, the support staff who depend on us for their employment, and Shaw-

nee County through the end of this CHL hockey season, including the play-offs. I do not believe that money or money damages can ever fully or adequately compensate FCC and the Topeka Scarecrows for the injuries they will directly and indirectly suffer if the team is not permitted the opportunity to complete this season and compete for the CHL championship.

(Plaintiff's Ex. 1, ¶ 14). The CHL characterizes any injury to FCC's reputation and economic interests as "self-inflicted" and insufficient.

It is certainly true that FCC's own actions have played a part in jeopardizing, if not harming, its reputation and that of the Topeka Scarecrows in this community and beyond. Even so, to terminate now the regular season of a fledgling club when a play-off berth seems imminent is likely to create such disappointment and to engender such hard feelings that FCC would be forced to remove itself from any further involvement with hockey in this community. The loss of business reputation and loss of future economic opportunities to FCC qualifies as irreparable harm because of the extreme difficulty and uncertainty in proving and calculating the same in this case.

*Balance of Harm*

██ The CHL argues it will incur additional costs if the TRO continues. The testimony of Tom Berry, the CHL's commissioner, estimates the league will lose $30,000 or $40,000 after reimbursing teams for their additional costs from schedule changes and extra travel and for their lost gates. Commissioner Berry admitted on cross-examination that the CHL had no contractual or legal obligation to reimburse teams for these additional costs or lost revenues. It also became clear during cross-examination that these costs and lost revenues were due to the odd number of

teams remaining after the CHL terminated the first-year team of Border City Bandits and the Topeka Scarecrows on February 20, 2001, and after the TRO became effective on February 21, 2001, that prevented the Scarecrows' termination. At this juncture, the court is not convinced that the CHL's alleged costs and lost revenues are a proper consideration in the balance of harms. Even assuming that they are, the court believes the harm to the plaintiff, its employees and agents substantially outweighs any harm to the CHL.

*Public Interest*

■ Public interest weighs heavily in favor of permitting the Scarecrows to finish their play for this season. The fans and season ticket holders of Scarecrows are the public most directly impacted by what occurs in this action. Not only would they lose money on their tickets, but they would lose an entertainment venue for them and their families. Finally, the embarrassment to this community for one of its sport teams to be denied the chance to finish its season cannot be overlooked.

*Substantial and Doubtful Questions on the Merits*

■ Because the first three elements for a TRO have been met, the plaintiff need only raise questions going to the merits that are so serious, substantial, difficult and doubtful as to be a fair basis for litigation and as to warrant more deliberate investigation.

The plaintiff alleges the CHL breached the implied covenant of good faith and fair dealing by not enforcing its rules and regulations on team salary caps and accurate reporting of the same. "CHL's failure to enforce the incorporated rules regarding the salary cap causing the loss of substantial revenue to FCC represents a breach of the implied of good faith and fair dealing." (Dk.12, p. 13). Though the plaintiff faces several serious legal hurdles in this claim, there are substantial questions here that warrant more deliberate investigation.

In sum, the court finds from the evidence and arguments presented that the plaintiff has sustained its burden of proving its entitlement to the TRO. The court denies the defendant CHL's motion to dissolve the TRO.

## EXTENSION OF THE TRO

■ A court may extend a TRO for an additional ten days "for good cause shown" and for longer periods upon the consent of the parties. Fed.R.Civ.P. 65(b). The rule does not define "good cause." There are few decisions meaningfully applying this standard. A leading treatise offers "[a]lthough there does not seem to be any case law on what constitutes 'good cause' for purposes of extending a Rule 65(b) order, a showing that the grounds for originally granting the temporary restraining order continue to exist should be sufficient." 11A Charles A. Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure*, § 2953 p. 279 (1995). In *S.E.C. v. Comcoa Ltd.*, 887 F.Supp. 1521, 1526 n. 7 (S.D.Fla.1995), "good cause" was the court's need for "time to fully consider the various arguments and motions of the parties." In other contexts, the "good cause" standard focuses on the diligence of the party seeking the change who "must show that despite due diligence it could not have reasonably met the scheduled deadlines." *Deghand v. Wal–Mart Stores, Inc.*, 904 F.Supp. 1218, 1221 (D.Kan.1995) (the standard for modifying a pretrial scheduling order pursuant to Fed.R.Civ.P. 16(b)) (citation omitted). Logically for Rule 65(b), "good cause" would include that a moving party despite its diligent efforts needs additional time to prepare and present its preliminary injunction, that the court's calendar cannot reasonably accommodate an earlier setting for the preliminary injunction hearing, or that the pendency of dis-

covery or related proceedings necessitates additional delay.

The grounds in support of the TRO, as have been discussed above, would still exist and justify an order filed March 12, 2001, extending the TRO for good cause shown. In addition, the plaintiff contends it needs to conduct limited discovery in preparation for and in support of its anticipated preliminary injunction motion. The court requests the parties to file no later than noon on March 12, 2001, their individual reports of what discovery is necessary in preparing for the preliminary injunction hearing. The court will conduct a telephone conference with the parties shortly thereafter to determine if the parties have agreed on a discovery schedule and, if not, to resolve that matter. The court informs the parties that it will be assisting the District Court of New Mexico with its overcrowded docket by sitting in Las Cruces, New Mexico, for the entire week commencing March 19, 2001. Consequently, the court is unavailable that week and will reserve filing any decision extending the TRO until March 12, 2001, after reviewing the parties' discovery plans.

## AMOUNT OF SECURITY

Rule 65(c) provides that "[n]o restraining order ... shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." The court has been informed the parties have met and agreed that in the event the TRO is extended then the plaintiff will have until Wednesday, March 14, at 5:00 p.m., to post a $25,000 cash bond. The court will address the issue of security in the order to be filed March 12, 2001.

## MOTION TO INTERVENE

At the hearing, the plaintiff said it did not oppose this motion filed by the Board of County Commissioners of the County of Shawnee County, Kansas, but the defendant announced its opposition. The court gives the defendant until March 13, 2001, to file a written memorandum in support of its position. The court takes the motion under advisement pending the filing and consideration of the defendant's memorandum opposing intervention.

IT IS THEREFORE ORDERED that the defendant Central Hockey League, Inc.'s motion to set aside (Dk.4) the temporary restraining order ("TRO") issued by the District Court of Shawnee County, Kansas, is denied, and this TRO will expire on March 12, 2001, absent an order filed that day extending the TRO for no more than ten additional business days for good cause shown or for a longer period upon the consent of the parties;

IT IS FURTHER ORDERED that the motion to intervene (Dk.13) filed by the Board of County Commissioners of the County of Shawnee County, Kansas, is taken under advisement pending the filing and consideration of the defendant's memorandum opposing intervention to be filed no later than March 13, 2001;

IT IS FURTHER ORDERED that the plaintiff Flying Cross Check, L.L.C.'s amended motion to extend the TRO (Dk.15) is taken under advisement until March 12, 2001, pending the court's review of the parties' discovery plans.

## MEMORANDUM AND ORDER

The case comes before the court on the plaintiff Flying Cross Check, L.L.C.'s amended motion to extend the temporary restraining order (Dk.15). In its order filed March 8, 2001, the court took this motion under advisement pending its review of the parties' discovery plans to be filed no later than noon on March 12, 2001. (Dk.17). The parties having timely filed their submissions and a telephone confer-

ence having been held, the court is ready to rule.

The parties agree to extend with certain modifications the temporary restraining order ("TRO") through the completion of the regular season and, in the event that the Topeka Scarecrows qualify for the playoffs, through the completion of playoffs. The first modification is that the defendant Central Hockey League, Inc. ("CHL") is permitted to make the following changes to the remaining regular season schedule of the Topeka Scarecrows:

March 18, 2001—Topeka at Memphis

March 20, 2001—Wichita at Topeka

March 21, 2001—Memphis at Topeka

March 27, 2001–San Antonio at Topeka

These scheduled games are in lieu of any games previously scheduled on those same days. The second modification is that the plaintiff Flying Cross Check, L.L.P. will post an appropriate surety bond with the court in the amount of $25,000 no later than 4:30 p.m. on Wednesday, March 14, 2001. If the bond requirement is not satisfied by that deadline, the TRO will expire at that time. The third modification is that the FCC will contribute its proportionate and equal share to the Playoff and Ring Pool as required by the terms of Section 20 of the 2000–20001 CHL Rules and Regulations. Unless further ordered by the court, the FCC's required contribution to this playoff pool shall not exceed $5,000.

IT IS SO ORDERED.